2024 IL App (1st) 231089

No. 1-23-1089

Opinion filed March 4, 2024

FIRST DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | |
|---|---|
| | ) Appeal from the |
| | ) Circuit Court of |
| *In re* AVERY F., also known as Averi F., and ALIJAH F., | ) Cook County. |
| | ) |
| Minors-Appellees, | ) No. 19-JA-5 and |
| | ) 20-JA-581 |
| (The People of the State of Illinois, Petitioner-Appellee v. | ) |
| Alicia F., Respondent-Appellant). | ) The Honorable |
| | ) Shannon P. O'Malley, |
| | ) Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Justices Lavin and Coghlan concurred in the judgment and opinion.

**OPINION**

¶ 1     The mother-respondent, Alicia F., appeals from the orders of the trial court finding minors Avery F. (also known as Averi F.) and Alijah F. neglected under a theory of anticipatory neglect, adjudicating them wards of the court, and finding that the respondent is unable to care for or protect them. Appellee briefs have been filed by the State and by the Cook County Public Guardian on behalf of the two minors. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3     From 2014 to 2023, the respondent was married to Joshua F. (father), and together they have

five children: daughter Anaya (born 2014), daughter Jurnee (born 2016), son Josiah (born 2017), daughter Averi[1] (born 2018), and son Alijah (born 2020). This appeal involves only the respondent's challenges to the above orders concerning the two youngest children. The father is not a party to this appeal. Although this appeal also does not involve the cases for adjudication of wardship of the three oldest children, the background of their cases was introduced into evidence relevant to the State's theory that Averi and Alijah are subject to anticipatory neglect. Accordingly, we begin with this background as to the three oldest children.

¶ 4                                    A. Older Siblings' Cases

¶ 5                                          *1. Anaya*

¶ 6        In April 2014, two months after Anaya was born, she was taken to a hospital and diagnosed with the following injuries: (1) subdural brain hemorrhages of varying ages, (2) intradural hemorrhage throughout the length of her spinal cord, (3) injury to her spinal ligaments, (4) multiple preretinal hemorrhages of both eyes and vitreous hemorrhage of the left eye, (5) multiple rib fractures of varying ages, (6) acute liver injury, and (7) brain ischemia (dead tissue). The State filed a petition for adjudication of wardship, and she was taken into custody of the Department of Children and Family Services (DCFS). It was stipulated in those proceedings that Dr. Marjorie Fujara, a physician with board certification in pediatrics and child abuse pediatrics, would testify to a reasonable degree of medical certainty that Anaya's injuries "are inflicted and are indicative of chronic child physical abuse." From the time of her birth until the she was taken into DCFS custody, Anaya had been in the care of either her parents or her grandparents. It was the position of the parents that they did nothing to cause Anaya's injuries and did not know how they had

_____

[1] It appears that the correct spelling of this minor's name is "Averi." However, the spelling "Avery" was retained in the caption.

occurred. No party sought a perpetrator finding.

¶ 7        In September 2015, based on the above facts, the court entered an adjudication order finding that Anaya was neglected based on an environment injurious to her welfare, abused due to the infliction of physical injury, and abused due to the creation of a substantial risk of physical injury by other-than-accidental means. No perpetrator of the abuse was identified. In December 2015, a disposition order was entered adjudicating Anaya a ward of the court, finding the respondent and the father unable to care for or protect her, and placing her in the guardianship of DCFS. In August 2018, an order was entered closing Anaya's case to private guardianship.

¶ 8                                        *2. Jurnee*

¶ 9        In February 2016, one week following the birth of Jurnee, the State filed a petition for adjudication of wardship. Initially, the trial court entered an order of protection that allowed Jurnee to remain with the parents.[2] However, two months later, on April 16, 2016, Jurnee presented to a hospital with subconjunctival hemorrhage to her eye and fractures to her ribs, clavicle, both legs, both arms, and multiple fingers. The protective order was vacated, and the case proceeded to an adjudicatory hearing that spanned several days. The State presented three expert medical witnesses who expressed opinions that Jurnee's injuries were the result of abuse. The parents also presented two expert witnesses who expressed opinions that there may have been other causes of the injury.

¶ 10       On November 29, 2016, the trial court entered an adjudication order finding that Jurnee was neglected based on an environment injurious to her welfare and abused due to the infliction of

_____

[2] Certain details from the cases for adjudication of wardship of Jurnee and Josiah are taken from a motion *in limine* presented to the trial court prior to the adjudicatory hearing in Averi's case, although these facts were not all entered into evidence in the cases for Averi or Alijah. The respondent, while represented by counsel, filed a response in the trial court stating that the pertinent facts as set forth in the motion *in limine* are accurate. The respondent reiterates their accuracy on appeal, and all parties cite facts taken from this motion *in limine* in their appellate briefs. The supporting exhibits to this motion *in limine* are not included in the record on appeal in this case.

physical injury and the creation of a substantial risk of physical injury by other than accidental means. On December 2, 2016, the trial court clarified its adjudication order, stating that it found that the opinions expressed by the parents' expert witnesses were not susceptible to peer review and that many of the factual premises required for their opinions were nonexistent, "including the existence of osteogenesis imperfecta or a genetic disease that would cause Jurnee's injuries." The trial court found, with the exception of the clavicle injury, that all of Jurnee's other injuries were "the result of non-accidental physical abuse." The trial court found that the adjudication testimony ruled out other causes for Jurnee's injuries, such as other illnesses, genetic causes, and rickets. Although the trial court did not make a perpetrator finding, it found "that natural mother and natural father have had primary, exclusive control and alone time with Jurnee." In April 2017, a disposition order was entered adjudicating Jurnee a ward of the court, finding her parents unable to care for or protect her, and placing her in the guardianship of DCFS.

¶ 11                                   *3. Josiah*

¶ 12        One week following Josiah's birth in 2017, a petition for adjudication of wardship was filed on his behalf. Based on a stipulation of facts, the trial court ultimately adjudicated Josiah as neglected "based upon anticipatory neglect" on October 25, 2017. The stipulation of facts provided in part that the family's caseworker from Children's Home and Aid would testify that the parents had completed all reunification services except individual therapy, that "they still have not made progress about why the siblings' cases came into the system," and that returning Josiah to their care would pose a risk of harm to him "because [the parents] have not acknowledged that [Josiah's] siblings were physically abused."

¶ 13        Several weeks later, on November 15, 2017, the parents attended a meeting with Dr. Margaret Scotellaro, a treating pediatrician of Anaya and Jurnee who specialized in child abuse. Both the

respondent and the father later testified, at the dispositional hearing in Josiah's case on January 18, 2018, that this meeting with Dr. Scotellaro had helped them come to the conclusion that both Anaya and Jurnee had been abused. Both reiterated that they had not perpetrated this abuse and did not believe that their spouse had done so either. The trial court adjudicated Josiah a ward of the court, found both parents unable to care for or protect him, and placed him in the guardianship of DCFS. Citing the lapse in time between the injuries to the older children and the parents' acknowledgement of abuse, the trial court stated that the parents "are really at ground zero in terms of addressing the physical abuse to Anaya and Jurnee in individual therapy, which is a requirement in the service plan and which would be expected by the Court before the Court could find that they're fit, able, and willing to care for the child." The court found them unable to care for or protect Josiah "because they need to continue in reunification services, including that individual therapy, to address and process the realization that Anaya and Jurnee were abused."

¶ 14    On February 13, 2018, the respondent anonymously posted an article she had written to the website blackdoctor.org. The article's title was "I Was Accused of a Crime that Doesn't Exist—When Politics Meet Medicine." This article was mentioned in testimony but was not admitted into evidence in the cases of Averi or Alijah.

¶ 15                    B. Adjudication of Neglect for Averi

¶ 16    Averi was born on December 18, 2018. On January 4, 2019, the State filed a petition for adjudication of wardship, alleging that she was neglected because her environment was injurious to her welfare and abused due to substantial risk of physical injury. The factual basis for the allegations were as follows:

"Parents have four prior indicated reports for head injuries, bone fractures, internal injuries and substantial risk of physical injury/environment injurious to health/welfare.

Parents have three other minors who are not in their care with findings of physical abuse, abuse and neglect having been entered. Parents minimize that this minor's siblings were physically abused while in their care. Mother and father are in need of continued progress in reunification services prior to being able to safely parent a child. Parents are married and reside together."

That petition was later amended to add that the "parents believe this minor's siblings' injuries may have been due to a medical condition." Based on the facts in the petition, the trial court found probable cause existed that Averi was abused or neglected and granted temporary custody of Averi to DCFS.

¶ 17    On April 19, 2021, an adjudicatory hearing was conducted on the petition. Prior to the hearing, the trial court granted a motion *in limine* by the State to bar testimony relitigating the issue of physical abuse of Anaya and Jurnee. The court admitted four exhibits into evidence: a therapy report for each of the parents, the family service plan from October 2018, and various orders and stipulations of facts from the cases of Anaya, Jurnee, and Josiah. We take note that the family service plan includes in part the following statements:

"[The respondent] is currently engaged in therapy to address the reasons why the case came into care. While [her] engagement in therapy is satisfactory, [she] is in need to further process her acknowledgement of abuse and the concerns presented in the July 2018 [Cook County Juvenile Court Clinic] *** recommendations for individual therapy:

'Both parents should work on addressing the following issues: *** processing their thoughts on what to look for related to physical abuse of the children (both in terms of physical/behavioral signs with the children, and related to potential perpetrators of abuse); process the abuse to the children at a deeper level with

discussions around the children's experience of abuse, rather than just stating it occurred[.]' "

¶ 18     The State's first witness was Hillary Dvorak, the assigned caseworker for the family at the agency Children's Home and Aid from May 2018 to September 2019. She testified that after Averi was born, she was concerned about Averi remaining in the parents' custody due to their failure to make substantial process on the protective factors identified by the juvenile court clinic in its 2018 assessment of the services required for reunification with Jurnee and Josiah. Dvorak explained that the juvenile court clinic's report had stated that each parent needed individual therapy to work on empathizing with the children's experience of trauma, taking responsibility for their role as role as parents, and addressing the protective factors needed to prevent any further harm to the children. Dvorak testified that there were concerns about the genuineness of the respondent's initial acknowledgment that the children's injuries were the result of abuse, due to the article she posted online in February 2018 stating that the children's injuries were the result of a medical condition. She testified that the agency's individualized treatment plan for the respondent indicated that she still had important aspects from the juvenile court clinic report to cover in treatment. She testified that as of the time when Averi was taken into custody in January 2018, the agency was not even recommending unsupervised day visits with Jurnee or Josiah.

¶ 19     On cross-examination, Dvorak was asked to further explain her testimony about the genuineness of the parents' acknowledgement of abuse. She answered that the juvenile court clinic report stated that the parents needed to show a change in their thought process and a deeper internalization of the abuse that occurred to the children, and that is what she meant.

¶ 20     On redirect examination, Dvorak testified that for the agency to conclude that the parents were making progress, they had to understand that the injures were due to abuse as opposed to

being caused by an accident or something else. They also had to show that by their behaviors, such as discussions within therapy empathizing with the trauma that had occurred to the children. During the time she was caseworker until Averi came into care, the parents had not done that.

¶ 21　　　The second witness to testify was DCFS investigator Marcelita Vargas. She provided background testimony about how DCFS became involved in Averi's case due to the pending cases involving the respondent's older children. She testified that, upon speaking with Dvorak, it was the recommendation of DCFS that Averi be removed from the respondent's care due to the serious injuries to her older siblings. She testified that, because it is unknown how the injuries to the older children occurred, it was a risk to allow Averi back into the home as a newborn baby. She also testified that, based on her conversation with Dvorak, the parents' lack of progress in indicating that Anaya and Jurnee were physically abused was a factor in her opinion concerning Averi's removal from the parents. No cross-examination occurred, and all parties then rested.

¶ 22　　　Following closing arguments, the trial court entered an adjudication order finding Averi neglected due to injurious environment under the theory of anticipatory neglect. The trial court explained the basis of its ruling as follows:

　　　　　"Based upon a preponderance of the evidence, considering what's in the best interest of the minors, this is a pretty simple case. *** [T]wo other kids besides Averi were injured horribly. The child returns home, the child comes back, the child is injured.

　　　　　The parents have not come to the realization that abuse occurred, abuse and injury. Looks like the parents are trying to blame it on someone else, purpose unknown, and they haven't faced up to the injuries that happened.

　　　　　*** I believe that Anaya had injuries to her head. There were different stages of healing. Injuries all over her body.

Jurnee *** was given back to the parents and then came back. She had all kinds of injuries all over her body, to her bones. The parents haven't acknowledged abuse occurred.

\* \* \*

The parents must understand that the injuries happened due to abuse and not to an accident. There is extreme risk of harm. The parents don't realize something wrong is going on. It wasn't an accident.

No one is telling them to admit or to say that they did it. They just have to realize and understand that the injuries that happened are not due to an accident.

They don't get it. If they still don't get it, then there is injury to the child, and I am not returning the child home just yet for now."

¶ 23                                    C. Adjudication of Neglect for Alijah

¶ 24        Alijah was born on March 27, 2020. The State filed a petition for adjudication of wardship on April 1, 2020. Its material allegations were similar to those of the petition in Averi's case, namely that the parents had four indicated reports for head injuries and bone fractures, that they had four other minors in the custody of DCFS with findings of abuse or neglect, and that temporary custody was not recommended due to the parents' continued denial that the extensive injuries to Alijah's two older siblings were caused by physical abuse despite the court's findings. The trial court entered an order finding that probable cause existed that Alijah was abused or neglected and granted temporary custody of Alijah to DCFS.

¶ 25        On September 9, 2022, an adjudicatory hearing was conducted on the petition for adjudication of wardship. Upon request by the State, the trial court took judicial notice that in Averi's case, the court had made findings of neglect based on anticipatory neglect due to injuries to her siblings, whom the parents do not acknowledge as abused.

¶ 26        The State's first witness was Cynthia Celestine, the supervising investigator for DCFS with respect to Alijah's case. She testified that the case came to the attention of DCFS following a hotline call. After meeting with caseworker Marima Ali on March 31, 2020, Celestine made a final determination that the respondent and the father were indicated on an allegation that Alijah was at substantial risk of physical injury due to an environment injurious to his health and welfare by neglect. Her basis for this determination was the parents' extensive history with DCFS, the prior history of injuries to their other children, and Jurnee's being placed in their care under a protective order but then experiencing a head injury and bone fractures. She testified that her agency recommended that protective custody be taken of Alijah, which occurred on April 1, 2020. The reason for this was that the parents had other children in care, Alijah was a newborn and could not protect himself, the parents had not complied with recommended services to the extent that the children could return home, and they had not rectified the situation that brought the family to the attention of DCFS. She testified that another concern behind the decision to take Alijah into protective custody was that the parents still had not indicated that they understood that the injuries to Jurnee and Anaya were due to abuse.

¶ 27        The State's second witness was Scott Wolff-Klammer, a supervisor at Children's Home and Aid who had been assigned to the cases for Jurnee, Josiah, and Averi since October 2019. Through his testimony, a DCFS integrated assessment and a family service plan, both from February 2019, were identified and admitted into evidence. He testified that, at the time he was assigned to the case, the main service that the respondent needed to complete for reunification with Jurnee, Josiah, and Averi was individual therapy to address that the injuries to Anaya and Jurnee were caused by abuse, as recommended in the 2018 juvenile court clinic report. He testified that the agency was not recommending unsupervised visitation at that time because the parents had not gained an

understanding that the injuries to Anaya and Jurnee were from abuse.

¶ 28    He testified that on February 4, 2020, both parents arrived at his agency's office unannounced to discuss the respondent's pregnancy. During that discussion, the respondent stated to him that she was a carrier of Ehlers-Danlos syndrome and that she wanted genetic testing to be done on the four older children. He explained his understanding that this was a genetic condition that can cause stretching of skin and delicate bones. He testified that also during that discussion, he clarified what the agency needed from the parents in therapy per the juvenile court clinic's recommendations, which was recognizing that the injuries to Anaya and Jurnee were caused from physical abuse.

¶ 29    Wolff-Klammer testified that after this meeting, he spoke with Dr. Scotellaro about the respondent's concerns that Ehlers-Danlos syndrome could have caused the bone breaks to Anaya and Jurnee. He testified that Dr. Scotellaro told him that the children had undergone extensive genetic testing and that Ehlers-Danlos syndrome had been ruled out. He testified that his agency's recommendation at the time Alijah was taken into protective custody that he not be returned to the parents was due to the concern that he was at risk of harm due to the parents' inability to recognize the signs of abuse to Jurnee and Anaya and that their injuries had come from physical abuse.

¶ 30    On cross-examination, Wolff-Klammer testified that he was not aware of whether the request for genetic testing of the children had come from the respondent's physician. He was asked about testimony that he had given during an earlier hearing on temporary custody, in which he stated that the agency had rejected a relative, Ms. Oliver, to serve as Alijah's temporary guardian, due to the risk posed to Alijah by Ms. Oliver's failure to identify that the respondent and the father were the named perpetrators of abuse.

¶ 31    On redirect examination, Wolff-Klammer clarified that the parents were not being asked to indicate that they hurt a child, but they had to be able to determine risk to have a child in their care

and custody. He does not believe they could understand that because they do not believe that Jurnee and Anaya were physically abused. At that point, all parties rested.

¶ 32    Following closing arguments, the trial court entered an adjudication order finding Alijah neglected due to injurious environment. In ruling, the trial court stated the following:

"[B]ased on a preponderance of the evidence, I find the testimony of Scott Wolff-Klammer to be credible because it was credible. This is all based upon a preponderance of the evidence. We had medical doctors, and they confirmed that it was due to physical abuse. Parents still don't think physical abuse happened, even though there were prior findings that physical abuse happened. We are blaming it on medical issues.

The child was returned home and came back, and another child was severely injured. This is ongoing. They still don't recognize or will admit that physical abuse occurred, and it's all they have to do, and they still will not do that.

* * *

As to Alijah, it's NEI based on anticipatory neglect."

¶ 33                    D. Dispositional Hearing for Averi and Alijah

¶ 34    On May 17, 2023, the matter proceeded to a dispositional hearing concerning both Averi and Alijah. The State's case commenced with the trial court taking judicial notice of its prior findings of neglect as to Averi and Alijah. The trial court also admitted two exhibits upon request of the State, which were DCFS integrated assessment reports focused on the two minors respectively. Four exhibits by the public guardian were also admitted into evidence at that time: a permanency planning report, a current service plan, and 2023 parenting capacity assessments for each parent.

¶ 35    The State called the respondent as its first witness. She testified that she and the father had divorced in Illinois as of April 14, 2023, but that she had not provided her caseworker with any

documentation concerning her divorce. She testified that she had moved to Tennessee as of July 2022. She was testifying via Zoom from her home in Tennessee, and the father was in the room with her. However, she stated that they did not reside together and that she had no knowledge of where the father resided. She was not aware of whether the father had ever lived in Tennessee.

¶ 36      The State next called the father to testify. He testified that he had recently moved to Franklin, Tennessee. He believed that the respondent also resided in Franklin. However, they lived in different residences. The father stated that he did not know how far away they lived from one another or how long it had taken him to get to the respondent's residence that day.

¶ 37      The State then called Leslie Martinez, a caseworker for Children's Home and Aid since April 2021. Martinez provided background testimony about how each of the parent's minor children had come into the care of DCFS. She then testified to the respondent's participation in recommended services. This included the respondent's completing of a nurturing parent program in 2019, which included parenting classes and coaching. She also completed all sessions of individual therapy in 2019. Martinez testified that one of the concerns in therapy was the respondent's acknowledgment of the reason why Anaya and Jurnee had come into care, as well as protective factors for therapy for the children. She testified that the juvenile court clinic had recommended that the respondent complete a parenting capacity assessment, which occurs when parents have an issue making progress toward the returning home of their children. In this case, the psychologist involved in the parenting capacity assessment had concerns that the respondent had failed to acknowledge the reason why the cases of Anaya and Jurnee had come into care. Martinez testified that was the agency's major issue as well.

¶ 38      Martinez testified that the respondent never had unsupervised visitation with Averi or Alijah, nor had the agency ever recommended it. She explained that unsupervised time is only given to

parents who acknowledge and understand why their children came into the care of DCFS, and the respondent had not stated why she believes the children came into care for abuse. Martinez stated that the respondent's stated belief is that the injuries to Anaya and Jurnee were due to osteogenesis imperfecta. However, Martinez explained that her understanding was that this condition had been ruled out by medical professionals in the past. She testified that the respondent was allowed once-weekly visits with Averi and Alijah, and she came from Tennessee to Illinois for these visits. She testified that respondent was consistent with visitation at first. However, from June 2022 until the present she attended approximately 40% of the visits she is allowed. Martinez testified that the visits go well when they occur.

¶ 39 On cross-examination by the assistant public guardian, Martinez clarified that the respondent had attended a total of two in-person visits with the children between the end of June 2022 and the hearing date of May 17, 2023, which was out of approximately 40 opportunities at visitation. She agreed that when she references the respondent not "acknowledging" abuse, what she means is that the respondent does not believe that Anaya or Jurnee were physically abused but instead believes that medical explanations exist for the injuries received by both. She testified that Averi and Alijah have never had any broken bones. She testified that prior to the respondent's January 2023 disclosure to the psychologist involved in the parenting capacity assessment that she had moved to Tennessee, the respondent had never informed Martinez that she was intending to move.

¶ 40 On cross-examination by the respondent, Martinez testified that either she, her program manager, or her supervisor responded to every e-mail by the parents providing their availability for visitation. She testified that the agency tried its best to accommodate the schedules that the parents provided. She testified that the respondent had a "virtual visit" with the children in September 2022, and an in-person visit in December 2022. Martinez testified that those were the

two months for which the parents provided availability. She testified that she was aware that the respondent's work schedule was ever-changing. She testified that she had asked the respondent to try to obtain the accommodation of one specific day off each week to allow for the scheduling of visitation, which she was not able to do.

¶ 41    Martinez testified that Averi lives in the same foster parents' home as her three older siblings, and Alijah resides in a different foster parent's home. Both minors' homes are safe and appropriate, with no signs of abuse, neglect, or corporal punishment. Both are well-bonded to their foster parents. Martinez testified that the recommendation of Children's Home and Aid was for Averi and Alijah to remain in their foster parents' homes for the time being.

¶ 42    Following the testimony by Martinez, the State rested. The assistant public guardian requested that the trial court also take judicial notice of all evidence presented at the adjudicatory hearings for Averi on October 19, 2021, and for Alijah on September 9, 2022, which the trial court did. The public guardian then rested.

¶ 43    The respondent then requested to provide a narrative statement, which was allowed. The respondent stated she moved to Tennessee in July 2022 due to work opportunities that did not exist in Illinois. She testified that, in 2022, she had reached out to the agency twice in July, once in August, twice in September, and once in December regarding visitation; the agency had responded to only one of these communications, that of September 12, 2022; and the respondent was informed that the agency did not have the means to accommodate visits on that date. The respondent then stated, "Additionally, I fully understand why the case came into care. However, I do not agree. But, I fully understand the reasons why this case came into care to this day."

¶ 44    On cross-examination by the assistant public guardian, the respondent stated that the reason she did not tell anyone at Children's Home and Aid about her move to Tennessee was that she

distrusted the agency, and she did not feel that it was in her best interest to let them know. She testified that there was no reason for her to tell the agency of her divorce, which was public information.

¶ 45      Following closing arguments, the court entered disposition orders as to both Averi and Alijah that adjudicated them wards of the court. The court also made a finding that the respondent was unable to care for or protect them, and it placed them in the guardianship of DCFS. In entering this order, the trial court stated the following:

> "Based on a preponderance of the evidence, I find the testimony of the caseworker Ms. Martinez to be credible. She was extremely credible.

> Basically the parents completed most, if not all of their services. Our only problem here is *** Anaya and Jurnee were physically abused. One child was returned. Came back abused. This is serious.

> Only two visits since July 2022. ***

> The doctor told the parents what happened to Jurnee. Osteogenesis *** Imperfecta was ruled out. The doctor told the parents. Soft tissue injuries, broken bones to the kids. Parents never had unsupervised visits. Parents still don't recognize it.

> And the parents left the State of Illinois. They went to Tennessee. They didn't tell anyone. It's important to cooperate with DCFS, comply with the services. And you have to be open about this.

> I am worried about the safety of these two minors at this time. The parents don't believe physical abuse occurred. They still don't. And that is important."

¶ 46      This appeal followed thereafter.

¶ 47                     II. ANALYSIS

¶ 48     On appeal, the respondent argues for reversal of the trial court's adjudication orders finding Averi and Alijah neglected due to an injurious environment under the theory of anticipatory neglect, as well as its disposition order finding the respondent unable to care for or protect them. The respondent argues that the trial court improperly based these determinations solely on evidence that she had not accepted or "internalized" the fact that Anaya and Jurnee had been severely injured as infants at the hands of an unknown perpetrator. She accepts that they were adjudicated as abused by the court, but she contends that a finding of anticipatory neglect as to Averi and Alijah cannot be based solely on her questioning of that conclusion or refusing to agree. She likewise contends that this is not an appropriate standard by which to evaluate her progress in therapy or to determine whether she is unable to care for or protect Averi and Alijah.

¶ 49     By contrast, the State and public guardian argue that the evidence supporting the trial court's orders included more than the respondent's refusal to acknowledge that Anaya and Jurnee were physically abused or maintaining that she was innocent of wrongdoing. They point out that, in addition to this factor, the trial court's conclusion that the respondent's home environment was injurious to the welfare of Averi and Alijah was supported by evidence including the severity of the injuries to the two older children and the fact that Jurnee was injured after initially being returned to the respondent after her birth. They further cite evidence that respondent has failed to complete services to address the reasons why Anaya and Jurnee had come into DCFS care, that she has never been allowed unsupervised visitation, and that visitation has been rare since she moved to Tennessee.

¶ 50     The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2022)) establishes a two-step the process to determine whether a minor should be removed from the custody of his or her parents and made a ward of the court. *In re Z.L.*, 2021 IL 126931, ¶ 58. The first step involves an

adjudicatory hearing to consider whether the minor is abused, neglected, or dependent. *Id.* ¶ 59. If such a finding is made, the matter proceeds to the second step, which is a dispositional hearing. *Id.* ¶ 60. There the court determines whether it is in the best interests of the minor and the public that the minor be made a ward of the court and, if so, the proper disposition best serving the health, safety, and interest of the minor and the public. 705 ILCS 405/2-22(1) (West 2022). The disposition may include committing the minor to care of DCFS if the court makes a finding including that the parents are "unable" for reasons other than financial circumstances alone to care for or protect the minor. *Id.* § 2-27(1). We note in this appeal that the respondent makes a singular argument, not one directed at these two steps individually.

¶ 51        Relevant here, a "neglected" minor includes any minor under 18 years of age "whose environment is injurious to his or her welfare." *Id.* § 2-3(1)(b). The terms "neglect" and "injurious environment" do not have fixed meanings in this context, but they draw their definitions from the circumstances of each case. *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 29. Generally, neglect involves failure to exercise the care that circumstances justly demand, encompassing both willful and unintentional disregard of parental duty. *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004). Injurious environment is an amorphous concept that includes the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children. *Id.*

¶ 52        Flowing from this concept of injurious environment is the theory of anticipatory neglect, which allows for the protection of children who have a probability of being subjected to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child. *Id.* at 468. Although the abuse or neglect of one child does not conclusively show the neglect of another, the abuse or neglect of one minor is admissible as evidence of the neglect of another minor for whom the respondent is responsible. *Id.*; see 705 ILCS

405/2-18(3) (West 2022). This theory recognizes that a parent's treatment of one child is probative of how that parent may treat his or her other children. *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 30. It is further a recognition that a juvenile court faced with evidence of prior abuse or neglect by parents should not be forced to refrain from acting until another child suffers injury. *Arthur H.*, 212 Ill. 2d at 477. Anticipatory neglect cases must take into account not only the circumstances surrounding the previously abused or neglected sibling, but also the care and condition of the child named in the petition. *Id.* at 468; see *Jordyn L.*, 2016 IL App (1st) 150956, ¶¶ 34-35. Each case is *sui generis* and must be reviewed according to its own facts. *Arthur H.*, 212 Ill. 2d at 463.

¶ 53    It is the State's burden to prove allegations of neglect by a preponderance of the evidence, meaning it must establish that the allegations are more probably true than not. *Z.L.*, 2021 IL 126931, ¶ 61. A trial court's finding of neglect will not be reversed unless it is against the manifest weight of the evidence. *Id.* A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Id.*

¶ 54    Applying the above standards, we hold that the trial court's adjudication orders finding that Averi and Alijah were neglected under the theory of anticipatory neglect were not against the manifest weight of the evidence. In so doing, we reject the respondent's assertion that the trial court applied an incorrect legal standard or placed undue emphasis on her refusal to recognize that the severe injuries to her older two children were caused by physical abuse and not by a preexisting medical or genetic condition. Instead, we find that the trial court, in its consideration of anticipatory neglect, gave appropriate consideration to the evidence showing the extent to which the respondent remained steadfast in her beliefs of a genetic or medical cause for her older children's injuries in the face of contrary medical evidence that their injuries were the product of inflicted physical abuse. The trial court also appropriately considered the evidence of the risk of harm posed to Averi

and Alijah if they were to remain in the respondent's care, due to her potential failure to take protective measures and to empathize with her older children's experience of abuse.

¶ 55    Importantly, and as the trial court fully recognized, we are dealing here with injuries to Averi and Alijah's older siblings that were horrific. Particularly in Anaya's case, they included multiple injuries to her brain, spinal cord, eyes, and other internal organs. The documentary evidence in this case indicates that her injuries have resulted in the development of significant special needs for which she is likely to require lifelong attendant care. And in Jurnee's case, the injuries included inner-eye hemorrhages and multiple bone fractures.

¶ 56    Second, this is not a case in which injury to an older sibling could be attributed to an isolated occurrence. This is somewhat self-evident by the fact that Averi and Alijah had two siblings experience injuries on separate occasions. Moreover, medical evidence in Anaya's case indicated that she had injuries of "varying ages," and the testimony of Dr. Fujara, a specialist in child abuse pediatrics, was that they were indicative of "chronic" physical child abuse.

¶ 57    Third, although it is unknown how the injuries to the older children occurred and no perpetrator finding was entered in either case, the evidence showed that none of the respondent's children had sustained injuries of this nature at any time when they were not in the respondent's care. In Anaya's case, the respondent was one of five individuals who had been her caregiver prior to her being taken into DCFS care (the others being the father and three grandparents). In Jurnee's case, the court found that the respondent and the father had exclusive control and alone-time with her. A related factor of great significance to the trial court was that Jurnee's injuries occurred after the court had initially returned Jurnee to the respondent's care subject to a protective order, due to progress that the respondent was then making in reunification services in Anaya's case. There is no evidence that any of the respondent's children have sustained injuries while in foster care.

¶ 58    Fourth, we find no evidence in the record that the respondent has a good-faith basis for believing that a medical or genetic condition was the cause of the older children's injuries. All evidence in the record indicates the contrary. A summary example is the following statement contained in the DCFS integrated assessment of February 2019, introduced into evidence at Alijah's adjudicatory hearing and the dispositional hearing:

> "Per the 2017 Integrated Assessment, it was noted that despite medical documentation that her two daughters had been physically abused, [the respondent] was unable to provide a reasonable explanation as to how the injuries occurred. She continued to assert that the injuries were the result of a medical problem, but according to the Rush University Medical Center Child Protection Team Consult by Margaret Scotellaro, M.D., dated 4/19/16 and reviewed as part of the 2017 [integrated assessment]: 'While there are medical disorders that may result in bone fragility and fractures that result from trivial injury, such as Osteogenesis Imperfecta or Rickets, the location/type of fractures that Jurnee has are very specific for abusive injury. Posterior rib fractures and metaphyseal chip/corner fractures are highly associated with physical abuse and not the location/type of fractures seen in cases of bone fragility. Jurnee's skeletal survey shows normal bone mineralization. In addition, subarachnoid and parenchymal brain bleeding as well as encephalomalacia are not associated with these medical conditions of bone fragility, but are common findings in physical abuse of young infants. Jurnee also has elevations in her liver enzymes that may be the result of traumatic liver injury.' "

We reject the respondent's argument that the good-faith nature of her belief is shown by the testimony of the caseworkers that she informed them that she had been diagnosed with Ehlers-Danlos syndrome or carried a gene that causes osteogenesis imperfecta. The only evidence in the

case was that the children had undergone extensive genetic testing, which had ruled those conditions out as a cause of injury. We further reject her argument that the good-faith nature of her belief is shown by a statement in the State's motion *in limine* suggesting that, at one time, she had disclosed Dr. Michael Holick to serve as an expert witness in Averi's case to testify regarding the cause of the older children's injuries. No such expert disclosure of Dr. Holick is contained in the record, and because of this we are unable to evaluate this argument.

¶ 59        Fifth, the record in this case contains evidence of efforts by various caseworkers and therapists to help the respondent understand that protecting her children from further instances of abuse in the future required her to understand that abuse was the cause of the older children's injuries. She was not being asked to acknowledge that she or any specific person was the perpetrator. The evidence showed that the absence of such understanding could lead to her exposing the children to inappropriate caregivers, failing to accurately assess their need for safety and protection, and failing to empathize with her children's experience of trauma.

¶ 60        The respondent argues that this court suggested in *In re Yohan K.*, 2013 IL App (1st) 123472, that a parent's refusal to acknowledge that one child's injury resulted from abuse does not support a conclusion by preponderance of the evidence that another child is likely to be abused or neglected in the future. In that case, an infant named Yohan was taken to a hospital after experiencing twitching indicative of a seizure. *Id.* ¶ 16. Yohan underwent extensive testing that demonstrated brain and retinal hemorrhages, as well as a possible knee fracture. *Id.* ¶¶ 19-27. DCFS became involved and petitioned for adjudication of wardship of Yohan and his older sister. *Id.* ¶ 43. At the adjudicatory hearing, the State presented the testimony of seven physicians of different specialties who expressed opinions that Yohan's injuries were caused by inflicted trauma or that nontraumatic explanations could be ruled out. *Id.* ¶¶ 46-74. By contrast, the parents presented the testimony of

three highly-credentialed physicians that Yohan's injuries were the product of preexisting medical conditions, including benign external hydrocephalus and congenital rickets, and the irregularity diagnosed as a knee fracture was not in fact a fracture. *Id.* ¶¶ 75-94. The trial court found that Yohan had been abused and his sister neglected, but at the dispositional hearing, it found the parents fit, willing, and able to parent both children. *Id.* ¶¶ 102, 104. Both orders were appealed. This court reversed the adjudication order, holding that the trial court's finding of abuse and neglect was against the manifest weight the evidence. *Id.* ¶¶ 146-147.

¶ 61    The portion of the opinion cited by the respondent here involved the court's affirmance of the disposition order finding the parents fit, willing, and able to care for their children. Similar to this case, the position of the State and guardian *ad litem* was that the parents' therapy services needed to result in an acknowledgement that Yohan was a victim of abuse in order to eliminate future risk and fully protect both children from further abuse by the perpetrator. See *id.* ¶¶ 105, 151. This court rejected that argument, finding no precedent for it. *Id.* ¶ 153. The court stated, "We completely reject any notion that parents should be declared unable to care for their children merely because they persist in their own belief of innocence of wrongdoing, particularly here where their insistence is supported by the evidence." *Id.*

¶ 62    We find that this statement from *Yohan K.* fails to aid the respondent in her argument. Quite simply, *Yohan K.* presented a situation in which the parents were reasonable in believing that their child's injuries were not the result of abuse. The parents' belief was substantiated by the testimony of three medical experts, and the experts disagreed about whether a knee fracture existed. As discussed above, no similar evidence exists in this case to support the reasonableness of the respondent's belief in a medical or genetic cause for her older children's injuries. Instead, the evidence here fully supports the conclusion that Averi and Alijah are at risk of harm due to the

respondent's failure to acknowledge that the severe injuries to their older siblings were caused by abuse and to accept that protective measures therefore need to be taken for her children's safety.

¶ 63    As indicated above, the respondent does not make a distinct argument directed at the dispositional stage finding that she was unable to care for or protect Averi or Alijah; rather, she makes a singular argument directed at both stages. The following standards govern the court's ruling at the dispositional stage. The determination for the court is whether it is in the best interests of the minor and the public that the minor be made a ward of the court. 705 ILCS 405/2-22(1) (West 2022). If the minor is to be made a ward of the court, then the court also determines the proper disposition best serving the health, safety, and interest of the minor and the public. *Id.* The disposition may include committing the minor to the care of DCFS if the court determines that the minor's parents "are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents." *Id.* § 2-27(1). The State bears the burden of proving inability to parent by a preponderance of the evidence. *In re Kelvion V.*, 2014 IL App (1st) 140965, ¶ 23. A trial court's dispositional finding of unfitness, inability, or unwillingness to parent will be reversed only if it is against the manifest weight of the evidence. *In re Harriet L.-B.*, 2016 IL App (1st) 152034, ¶ 30.

¶ 64    We hold that the trial court's disposition order finding that the respondent was unable to care for or parent Averi and Alijah, so as to warrant their placement in the care of DCFS, was not contrary to the manifest weight of the evidence. For the same reasons discussed above, we reject the respondent's argument that the trial court's finding of inability placed undue emphasis on her refusal to acknowledge that the injuries to her older children were caused by abuse. The trial court had ample evidence before it that the respondent's failure to reach this understanding prevented

her from making progress in the individual therapy aspect of reunification services, as it presented a risk to her children that she would fail to take protective measures to avoid exposing them to dangerous situations or people in the future or to recognize if they were injured by abuse. We note that the 2023 parenting capacity assessment in evidence stated that the children were at risk because the respondent had a weak bond with them, and her lack of understanding of the weakness of this bond was shown by her decision to move to Tennessee in July 2022. The evidence further showed that the respondent had visited her children only twice in the ten-month timeframe between her move to Tennessee and the dispositional hearing. Further, she did not inform the caseworker responsible for scheduling visitation about her move for nearly seven months, and even by the respondent's own testimony her efforts at contacting the agency to schedule visitation were sporadic. The evidence also showed that despite years of having children in the care of DCFS, the respondent had never progressed to the point of having unsupervised visitation with any of them. Accordingly, the trial court's finding that the respondent was unable to care for or parent Averi and Alijah was fully supported by the evidence.

¶ 65                                  III. CONCLUSION

¶ 66        For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 67        Affirmed.

*In re Avery F.*, 2024 IL App (1st) 231089

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 19-JA-5, 20-JA-581; the Hon. Shannon P. O'Malley, Judge, presiding. |
| **Attorneys for Appellant:** | Jeffrey W. Gunn, of Tapia-Ruano & Gunn P.C., of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Gina DiVito, and Marina C. Para, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain, Jill Runk, and Christina Schleich, of counsel), guardian *ad litem*. |