NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 240898-U

NOS. 4-24-0898, 4-24-0899 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 10, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* A.C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Peoria County |
| Petitioner-Appellee, | ) | No. 20JA173 |
| v. | ) | |
| | ) | Honorable |
| Andrew C. and Jennifer C., | ) | Derek G. Asbury, |
| Respondents-Appellants). | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Steigmann and Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, finding the trial court's decision to terminate respondents' parental rights was not against the manifest weight of the evidence.

¶ 2    On May 15, 2024, the parental rights of respondents, Andrew C. and Jennifer C., were terminated as to their minor son, A.C. Both Andrew and Jennifer appealed the termination, and their appeals were consolidated. Respondents argue the trial court erred in finding them unfit and determining it was in A.C.'s best interest that their parental rights be terminated. Jennifer additionally argues the court erred in denying her motion to dismiss the State's petition to terminate her parental rights.

¶ 3    Pursuant to Illinois Supreme Court Rule 311(a)(5) (eff. Jul. 1, 2018), the deadline for this court to file its decision in this case was November 12, 2024, 150 days after the notice of appeal was filed. However, Rule 311 allows a decision to be filed outside of that time limit where

good cause is shown. *Id.* Based on the complexity of the case, as well as numerous extensions of time for both parties to file their briefs, we believe such good cause has been shown.

¶ 4 We affirm the decision of the trial court.

¶ 5 I. BACKGROUND

¶ 6 Andrew and Jennifer are a married couple who share two children, E.C. (born in 2018) and A.C. (born in 2019). On April 9, 2020, the State filed a petition for adjudication of wardship of A.C., alleging he was abused and neglected by Andrew and/or Jennifer pursuant to section 2-3 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3 (West 2020)). The petition made the following factual allegations with regard to A.C.:

"A) On February 15, 2020, the minor was found to have swelling to the right orbital area, bruising, a hematoma over the right parietal scalp with supraorbital edema, a skull fracture, and contusion to the scalp. Medical professional[s] state that consideration should be given for non-accidental causes of trauma to explain these injuries; and

B) On April 5, 2020, while in the care of the parents, the minor was not breathing for approximately 20 minutes and suffered full arrest; and

C) On April 5, 2020, the minor was diagnosed with bruising to the right ankle, several rib fractures, fractures to the right femur, tibia, and fibula; fractures to the right and left proximal humerus, and fractures to the right and left distal humerus; and

D) The minor's physicians have been unable to find a medical reason for the minor's fractures and believe them to be the result of non-accidental trauma; and

- 2 -

E) On or about April 8, 2020, the minor was found to have hemorrhagic contusions where the brain and spinal cord join, and possible contusions in the lower thoracic spinal cord near the bottom of the rib cage."

¶ 7 Both A.C. and E.C. were placed into the temporary custody of the Illinois Department of Children and Family Services (DCFS). Jennifer and Andrew stipulated to the allegations in the petition. In a dispositional order dated October 3, 2022, both parents were found unfit, and the minors were made wards of the court. The basis of the trial court's finding regarding A.C. was "serious abuse and extensive injuries caused by court's finding of nonaccidental abuse." The basis of its finding regarding E.C. was "anticipatory abuse or neglect." The guardianship administrator of DCFS was named guardian of the children, with the right to place them. The parents were admonished that they must comply with their service plans and correct the conditions that led to the minors being taken into care or risk termination of their parental rights.

¶ 8 The same day as the dispositional order, the State filed a petition to terminate respondents' parental rights. The petition contained four counts, two for each respondent. It alleged that each respondent was unfit for (1) failing to maintain a reasonable degree of interest, concern, or responsibility as to A.C.'s welfare (750 ILCS 50/1(D)(b) (West 2022)) and (2) failing to protect A.C. from conditions in his environment injurious to his welfare (*id.* § 1(D)(g)). Both grounds of unfitness alleged that A.C. was repeatedly physically abused between January 1, 2020, and April 5, 2020, and such abuse could not have occurred without the parents' knowledge. A.C.'s specific injuries are listed in the petition as follows: "bruises to his face and body, a skull fracture, brachial plexus injury to his right arm, more than 20 fractures of various ages throughout his skeleton, injury to his brainstem and cervical spinal cord, injury to his thoracic spinal cord." The petition alleged that such injuries rendered A.C. a "motor incomplete quadriplegic."

¶ 9          Both parents denied all allegations in the State's petition. On January 12, 2023, the parents filed motions to withdraw their previously filed denials and dismiss the State's petition to terminate their parental rights. In an amended motion filed January 30, 2023, Jennifer argued, *inter alia*, that the State's petition was not authorized under sections 2-29(1) and 2-28(4) of the Act (705 ILCS 405/2-29(1), 2-28(4) (West 2022)) because it was filed without leave of court while the minors' permanency goal was still set at "return home." At a hearing on the motion, the trial court disagreed and found the State could file a termination of parental rights petition at its own discretion, including when the permanency goal was to return home. The court denied respondent's motion to dismiss the State's petition.

¶ 10         A hearing on respondents' parental fitness began on December 15, 2023, and spanned 10 days. Both the State and respondents presented numerous witnesses and exhibits, creating a body of evidence the trial court described as "substantial" and "very technical" in nature. Below, we present a summary of the relevant evidence from the unfitness hearing.

¶ 11                                A. The State's Witnesses

¶ 12         Karrie Kimmey testified that she was a daycare provider who cared for A.C. from mid-January 2020 to late February 2020. She testified that when A.C. began at her daycare, respondents told her he "did not like to be jostled around because he would cry and wince." They asked that daycare workers give special attention to his right arm and his legs, as they had noticed he did not use them. She testified that in the middle of February, A.C. was brought into daycare by Andrew with bruising and swelling on his head. Andrew identified the injury as a skull fracture and told her that while he was out of the room, E.C., A.C.'s sister, had dropped him from where they were both seated on the couch. Kimmey confirmed that she was a mandated reporter and if she had suspected child abuse, she would have called DCFS.

¶ 13        Another daycare provider, Trisha Fisher, also testified for the State. She stated she watched A.C. from late February to mid-March of 2020. She testified that A.C. was not an active baby and would rarely move. Jennifer asked Fisher to move A.C.'s legs and encourage him to unclench his fists, but Fisher stated that when she attempted to move him, "You could tell he didn't like it and it hurt." She further testified that she noticed bruises on A.C.'s face almost every day he was in her care. She stated Jennifer told her A.C. caused the injuries by putting his hands to his face or by resting his head on the edge of a "bumbo" seat, a plastic wraparound seat he would sit propped up in. She identified photos of A.C. posted to Jennifer's Facebook page with bruising visible on his ankle and face.

¶ 14        Craig Johnson, a detective with the Peoria Police Department, testified that he investigated injuries to A.C. after A.C. was admitted to the hospital on April 5, 2020. He interviewed Jennifer at the hospital where A.C. was taken and Andrew at the family's residence. He testified that the main floor of the family's home was approximately 700 square feet. He stated that Jennifer told him during her interview that the bruise on A.C.'s ankle came from the Velcro strap of one of his slippers being fastened too tightly. Both parents recounted an incident in which E.C. jumped on A.C. while he was on the couch. This was a separate incident from the incident between E.C. and A.C. in February that resulted in a skull fracture.

¶ 15        Jennifer was called to testify as an adverse witness by the State. She stated that on the day E.C. purportedly jumped on A.C., she did not take A.C. to the hospital because she and Andrew had discussed it with relatives in the medical field and did not feel it was necessary. However, when she picked him up a few days later she felt a "crackle" in his rib. She stated that Andrew similarly told her that when he put A.C. down to change him a few days later, he felt a pop, "like his rib popped."

¶ 16 She further testified that on the day A.C. sustained a skull fracture, she was at work while Andrew watched the kids. When Andrew called her to report A.C.'s injury, she came home and took him to OSF PromptCare. At OSF PromptCare, she was told by a medical professional that it was within her discretion whether to take A.C. to the emergency room (ER). She chose not to and instead took him home to monitor his symptoms. OSF PromptCare's discharge instructions were admitted as evidence. The instructions included a note from the treating nurse stating, "I discussed ER for further evaluation. Mom agreed and will go to [the emergency department] now." Further down, the instructions read, "Based on your exam today you need assessment beyond the scope of prompt care ***. *** Go directly to the emergency department for further evaluation and treatment." Handwritten notes on the sheet listed symptoms respondents should look out for when Jennifer took him home. Jennifer denied being aware of the printed instructions directing her to take A.C. to the ER and stated she was only advised of the symptoms to look out for when she took A.C. home. However, she did take him to the ER the following day, when she noticed his bruising and swelling had worsened.

¶ 17 Jennifer also recounted the events of April 5, 2020, when A.C. was hospitalized after suffering a cardiac arrest. She stated she was in the bathroom while Andrew was in the kitchen fixing E.C. breakfast. She met Andrew coming from the bathroom, and both noticed A.C. appeared blue and was gasping for breath. She testified that she ran next door to seek help from her neighbor, a fireman. She initially stated Andrew performed CPR on A.C. while she ran next door, but later clarified that she did not actually see him do so. She testified that the hospital told her the cardiac arrest was caused by a "mucus plug." She denied abusing A.C.

¶ 18 Julian Lin, M.D., testified that he was a pediatric neurosurgeon who was asked to consult on A.C. on April 6, 2020. An MRI revealed that A.C. had a swollen spinal cord and brain

stem. In his opinion, the damage was caused by a "whiplash type of injury." He stated this specific type of injury, wherein the spinal cord is damaged but there is no injury to the surrounding area, is common in infants due to their unique anatomy. He believed that A.C.'s spinal injury impeded his ability to breathe, leading to cardiac arrest. He acknowledged that injury in the spinal cord with no surrounding injury could also have been caused by infection and, at the time of his admittance to the hospital, A.C. tested positive for either rhinovirus or enterovirus. On further questioning, he opined that A.C.'s presentation was inconsistent with a viral infection.

¶ 19      Michelle Prince, M.D., testified that she examined A.C. on April 9, 2020. She testified that A.C. had several class metaphyseal lesions, a type of injury highly suggestive of nonaccidental trauma. She stated, "There are some teachings that call those fractures pathognomonic, meaning there is nothing else that causes them." She stated that A.C. had no pain response to any known areas of fractures. On questioning, she denied that a lack of point tenderness at any fracture sites suggested a metabolic cause for A.C.'s injuries, as opposed to a traumatic cause. She stated that even a metabolically caused fracture has pain and point tenderness. She testified that a lack of pain could be explained by the fractures healing or by significant spinal cord, brain, or peripheral nerve injury.

¶ 20      Channing Petrak, M.D., testified that she examined A.C. on April 6, 2020, after his medical team raised concerns about possible child abuse. On examining him, she noticed bruising on his right ankle that she did not believe could have been caused by slippers or as a result of having blood drawn from his heel while at the hospital. She believed it was consistent with an abusive grabbing. She testified that A.C. seemed to be in pain frequently. On April 13, 2020, he underwent a skeletal survey that revealed multiple fractures. The test was repeated on June 2, 2020, with no new fractures shown. She testified to each fracture present on A.C.'s skeletal survey, the

amount of force needed to cause the fracture, and whether each had a high specificity for abuse. Petrak concluded that A.C.'s fractures were likely due to child abuse over time. She reached the same conclusion regarding his facial bruises.

¶ 21 Megan Daghfal, M.D., testified that she interpreted A.C.'s skeletal survey on April 13, 2020, and found approximately 27 fractures. She stated that the fractures, in the absence of an underlying metabolic disease, had a high specificity for nonaccidental trauma. She testified that his bones appeared to be normally mineralized, with no signs of disease or disorder beyond the fractures themselves. On cross-examination, she acknowledged that a bone may lose 30 to 35% of its mineral content before it becomes apparent on imaging and that mineral content is "very important" in the strength of a bone. She also testified that the American College of Radiology and the Society of Pediatric Radiology set standards requiring a specific monitor resolution in viewing certain pediatric images, like skeletal surveys. The monitors she used to make her findings showed the pictures in high resolution, with a brighter light source to them, showing greater detail.

¶ 22 B. Respondent's Witnesses

¶ 23 Joseph Scheller, M.D., testified that, at respondent counsel's request, he reviewed the CT scans of A.C.'s brain and spine that were taken on April 6 and determined that A.C.'s brain was completely healthy and there was no indication of fracture to A.C.'s spine. He testified that he observed swelling in A.C.'s spinal cord but no surrounding tissue damage. He therefore believed the swelling was due to infection rather than trauma.

¶ 24 Jennifer testified that she never used corporal punishment on her children. She described her marriage with Andrew as strong and said the two communicated well. There had been no incidents of domestic violence. She denied that she or Andrew had ever abused A.C. She stated she never asked Andrew specifically if he had harmed their children, though they had

conversations about the source of A.C.'s bruises. She stated that when she or Andrew picked A.C. up by the arms, he did not express discomfort.

¶ 25 Andrew testified that when A.C. was born, he struggled to breathe and was taken to the neonatal intensive care unit. Andrew had concerns about A.C.'s development, stating that it appeared he was not developing as quickly as his sister, E.C., had. He testified that he and Jennifer spoke to A.C.'s pediatrician about this, as well as asking his babysitter and daycare providers to work on specific exercises. He testified to the incident in which he witnessed E.C. jump on A.C. and noticing a "muted, dull kind of a crackle, pop-type sensation" in A.C. in the following days. He noticed no external swelling or bruising, and A.C. did not react as if he were in pain, so they did not seek medical treatment. He stated that on the morning of April 5, 2020, A.C. had a cold and was dealing with persistent mucus build-up. He and Jennifer would swipe A.C.'s mouth with a baby wipe to clear the mucus, so this is what he did on April 5 when A.C. appeared to be choking. When A.C. still did not start breathing, Andrew performed CPR. He first stated he did not remember if he gave back blows in the course of his efforts, but he later stated he had. He confirmed their family home was "very small."

¶ 26 Phyllis Weiner, M.D., testified that all of A.C.'s injuries could have had nontraumatic origins. His cardiorespiratory arrest occurred at a time when he had an upper and lower respiratory viral infection involving severe mucus. If he had choked on mucus, his heart would have stopped. She also testified that a viral infection could have damaged his spinal cord and would not leave evidence of trauma to the spinal column itself. She testified that his low vitamin D levels could have caused the fractures in his bones, as "the majority of them were in an area of bone growth which is what is affected by vitamin D deficiency."

¶ 27    Chris Sullivan, M.D., testified that, in his opinion, A.C.'s deficiency in vitamin D (*i.e.*, rickets) and possibly vitamin C made his bones weaker than normal and susceptible to injury. He testified that normal handling with such a deficiency could have caused the fractures observed in A.C. He also disagreed with the injuries identified in A.C., stating he did not believe A.C. had cervical or thoracic spine fractures.

¶ 28    In its ruling, the trial court summarized the following undisputed facts. During the time period alleged in the State's petition, A.C. had multiple bruises on his body at different times. In February 2020, A.C. suffered a parietal skull fracture and, on April 5, 2020, went into cardiac arrest at the family home. Prior to April 5, 2020, no treating pediatrician or daycare provider ever made a report of abuse for A.C. While being treated at the hospital following his cardiac arrest, A.C. was found to have numerous fractures throughout his body that were at varying stages of healing. He also had low vitamin D levels and tested positive for either rhinovirus or enterovirus, although the test done could not determine which one specifically. After A.C.'s admission to the hospital on April 5, 2020, he suffered no known new fractures or bruises.

¶ 29    The trial court then discussed the contested evidence, which largely centered on the nature, number, and causes of A.C.'s injuries. The court stated:

> "The Court received extensive amounts of medical records through exhibits from both parties. The nature of what I'm looking at clearly is esoteric and highly technical. Expert witnesses were critical in, not only rendering opinions and conclusions, but also assisting the Court in developing a working understanding of the technical subject upon which I must rule."

The court discussed each witness presented by the parties and assessed their credibility. Although it took issue with some of the State's witnesses, the court found that the doctors presented by the

State were "generally credible" due to their licensure, their up-to-date education, and the fact that they were A.C.'s actual treating doctors. However, the court noted its hesitancy around one of the State's witnesses, Dr. Channing Petrak, and her role as a child abuse specialist, which required her to draw conclusions that "kind of parallel what the Court has to do factually." The court found her testimony on fractures indicative of child abuse credible, but it also noted that at one point, Dr. Petrak incorrectly identified a bruise on A.C.'s ankle in a photo shown to her that a subsequent photo revealed only to be a shadow.

¶ 30    Regarding respondents' witnesses, the trial court first noted that Andrew and Jennifer had certain inconsistencies in their testimonies but stated this could be related to "the reality of human perception and the fragility of memory" and that a "hallmark of dishonesty" is a perfectly aligned testimony, which indicates "collusion rather than truth." In general, the court found respondents' witnesses less credible than the State's because they were, in large part, nontreating doctors who were not current in their medical certifications. The court particularly took issue with one witness who used a non-industry-standard laptop to inform his testimony as to whether A.C. had bruising. The court stated, "[I]t makes it difficult to find his testimony reliable that there were no injuries because if he is not using the standardized equipment in their field to see the injuries, he may not see them."

¶ 31    The trial court concluded its discussion of the witnesses by stating:

"As it relates to generally the credibility findings of the witnesses, particularly as to the experts, I mean, it was clear the State's witnesses were stronger. *** There is no question the State's case is stronger. The question is, is this clear and convincing evidence which is the State's burden of proof."

¶ 32        The trial court discussed the evidence it viewed as proving the State's case. It noted numerous injuries on A.C. that were highly indicative of abuse in nonmobile infants, including clavicle, rib, and skull fractures. Although respondents argued A.C.'s injuries were caused by a vitamin D deficiency that led to diseases like rickets and scurvy, the court noted the medical literature suggested those diseases were rare and even in cases of rickets, fractures were uncommon.

¶ 33        On the other hand, the trial court noted evidence that weighed in respondents' favor, such as the fact that neither parent had ever been arrested for domestic violence and there was no history of child abuse with A.C.'s sibling, E.C. Additionally, no hotline calls were made by any of the various mandated reporters that encountered A.C. in the relevant time period. The parents also presented plausible explanations for A.C.'s skull fracture and rib injuries.

¶ 34        After its lengthy analysis, the trial court stated its conclusion:

"This case involved very technical medical evidence. This requires the Court to give great deference to the testimony of experts. I had a group of experts say essentially and unequivocally this was not abuse. And I have one group of experts saying *** unequivocally this was abuse. ***

I certainly find the State's treating physicians more credible. And I don't know how I can't. They are more up to date on their credentials and education. They are nonlegal consultants. They have superior equipment and facilities. ***

The majority of the medical literature and the exhibits, again, did not support the conclusion as it relates to what's being asked by the respondents for the rachitic—the rickets, the scurvy ***.

The Court also struggled with certain uncontested salient facts. ***I struggled with how the bruising of [A.C.] stopped after his admission to the hospital. I would imagine the hospital has in their testing and what they are doing is they are going to be same normal handling that would have been done in the home, and he doesn't get any bruises.***[W]ithout a vitamin D treatment suddenly his fractures just completely cease. And I struggle—this isn't even so much medical. It's just me using my, kind of, common sense. How does that happen? And I didn't really have an explanation ***.

Finally, it was pointed out by the State and it's correct, I can't analyze each incident in a vacuum. I have to consider this totality of events together and occurring together. *** Part of the weight I have to consider is all of this happened during this time frame with one child.

Although there has been no direct evidence which party or whether both committed the abuse, circumstantially its suggestive of the father, but there is no direct evidence of that. The prove-up of the counts don't require the State to specifically identify who, only that it occurred in their, so to speak, care and that they knew or should have known it was occurring and failed to protect the minor.

Here the evidence of the size of the home, the numerous incidents and the nature of the injuries, I think establishes they knew or should have known. Therefore, the Court finds the counts in the petition proven by clear and convincing evidence. And both parents are found unfit under the Adoption Act [750 ILCS 50/1 *et seq.* (West 2022)]."

¶ 35    At a best-interest hearing held over two days, the trial court heard testimony from foster parents, parents, counselors, a visitation supervisor, and a caseworker.

¶ 36    Nia MacFarland-Drye, a caseworker, testified that A.C. was strongly bonded to his foster parents and foster siblings, as well as being accepted within the wider community in which his foster family lives. She testified that his foster parents were attentive to his medical needs and experienced in assisting him. She also believed his physical safety was best ensured with his foster family, considering the person who caused his injuries had not been identified. She testified that the least disruptive placement for A.C. would be to continue living with his foster parents.

¶ 37    Angela Beddingfield, A.C.'s foster mother, testified that she told A.C.'s parents she was open to communication with them "anytime [they] wante[d]" and had invited them to visit A.C. at their church and for "most holidays." She admitted on cross-examination that while she and her husband initially had a positive relationship with respondents, it had "turned." However, she maintained that she did not know the reason and stayed open to communication with them. She discussed A.C.'s medical needs at length, confirming that he would likely never be mobile or able to breathe without assistance, and he would likely always use a feeding tube to eat. She acknowledged that, out of necessity, she had occasionally scheduled doctor's appointments for A.C. during times when he was supposed to have visits with his parents. She testified that she and her husband would be willing to adopt A.C. if respondents' parental rights were terminated. She further stated that if respondents' parental rights were terminated, she and her husband would support a continuing relationship between A.C. and his biological grandparents and sister.

¶ 38    Rebecca Arnold, a family service specialist, testified that she supervised visits between respondents and A.C. and had never witnessed questionable behavior, such as abuse or neglect, from either parent. She testified that both parents assist A.C. in his therapeutic activities

during visits and he appears bonded to them. She confirmed he refers to them as "dada" and "mom."

¶ 39    Jennifer testified that the relationship between her and Andrew and A.C.'s foster family changed when she believed the foster parents no longer supported reunification and wished to adopt A.C. She stated that A.C.'s foster parents did not keep her informed of his medical appointments and intentionally scheduled doctor's appointments during their parental visits at least five times. She testified that she was familiar with A.C.'s medical needs and had resigned from her employment to become A.C.'s primary caregiver. On cross-examination, she stated that she had not abused A.C. or witnessed her husband doing so.

¶ 40    Andrew testified that he had transitioned his employment to full-time remote working to assist in A.C.'s care. He testified that he accepted the trial court's findings of abuse, but he denied ever abusing A.C. or seeing his wife abuse him. He stated he believed A.C.'s conditions were related to medical issues. He testified that he engaged in services, including counseling and parenting classes.

¶ 41    On May 15, 2024, the trial court gave its ruling. The court restated its finding that A.C. suffered serious and significant nonaccidental injuries over a period of months while in the care of his parents, and those injuries resulted in temporary and permanent disabilities which required "24-hour care, seven days a week, 365 days a year without exception." The court stated that it knew A.C.'s foster parents were able to tend to his medical needs, as they had been doing so for years, whereas it could only speculate on respondents' ability to do the same.

¶ 42    The trial court also noted that A.C. had been living in the same placement since his removal from his parents' care. Due to his young age, this meant that almost 75% to 80% of his life had been spent with his foster parents, creating a stronger bond with them than with his birth

parents. Although the court acknowledged the parents may consider this unfair because A.C. was taken out of their care against their wishes, best-interest hearings are about objective considerations of the minor's well-being, without accommodation to parents' "general sense of fairness." Evidence also showed that A.C. had formed bonds with his foster siblings and larger foster community and that his foster parents had indicated they wished to adopt him.

¶ 43 The trial court therefore found that the State had proven by a preponderance of the evidence that it was in A.C.'s best interest to terminate Jennifer and Andrew's parental rights.

¶ 44 This appeal followed.

¶ 45                                    II. ANALYSIS

¶ 46 On appeal, respondents argue that the trial court's unfitness and best-interest determinations were against the manifest weight of the evidence. Additionally, Jennifer argues the trial court erred in denying her motion to dismiss the State's petition for termination of parental rights.

¶ 47                          A. Jennifer's Motion to Dismiss

¶ 48 Jennifer argues the trial court's denial of her motion to dismiss the State's petition was erroneous, as it was filed without leave of court and was barred by the decision to proceed on the underlying wardship matter. She relies on section 2-29(1) of the Act, which requires leave of the court to make a child who is a ward of the court the subject of a petition for adoption (705 ILCS 405/2-29(1) (West 2022)), as well as section 2-28(4), which she contends prohibits the filing of a petition to terminate parental rights while the permanency goal is a return home goal (*id.* § 2-28(4)). In further support of her position, she cites *In re T.B.*, 2018 IL App (2d) 180403-U, an unpublished case from the Appellate Court, Second District.

¶ 49         The State first argues that respondent's argument should not be considered, as she fails to cite any relevant legal authority and instead only cites an unpublished case from 2018. See Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023) (stating only unpublished cases published on or after January 1, 2021, may be cited for persuasive purposes). The State further argues that the case cited, *T.B.*, is distinguishable as it concerns a nonparent seeking leave of court to file a petition to adopt her grandchild. *T.B.*, 2018 IL App (2d) 180403-U. In contrast, the case before us concerns the State's petition to terminate parental rights.

¶ 50         Respondent asks us to interpret statutory language contained in the Act. "Statutory construction presents a question of law which we review *de novo*." *In re A.A.*, 2015 IL 118605, ¶ 21. Where statutory language is clear and unambiguous, we will not read limitations, conditions, or exceptions into it. *Id.*

¶ 51         To begin, we agree with the State that *T.B.*, even if able to be cited for persuasive purposes, is inapplicable. The *T.B.* court did not determine that leave of court must be obtained before filing a petition to terminate parental rights. It only discussed obtaining leave of court as a procedural step in filing an *adoption petition*. *T.B.*, 2018 IL App (2d) 180403-U, ¶ 41. Although termination of parental rights empowers the guardian of a minor to consent to adoption (705 ILCS 405/2-29(2) (West 2022)), a petition to terminate parental rights and an adoption petition are not interchangeable. Indeed, respondent does not argue why the two petitions should be treated as interchangeable, but merely treats them that way without any explanation.

¶ 52         To that end, the language of section 2-29 is clear. It provides, "*With leave of the court*, a minor who is the subject of an abuse, neglect, or dependency petition under this Act may be the subject of a *petition for adoption* under the Adoption Act." (Emphases added.) *Id.* § 2-29(1). The leave-of-court requirement applies only to petitions for adoption, not petitions to terminate

parental rights. We therefore reject respondent's argument that the State needed to obtain leave of court before filing its petition to terminate parental rights.

¶ 53        We employ similar reasoning in rejecting respondent's argument that a petition to terminate parental rights may not be filed while the permanency goal is still that of returning the minor home to his parents. Section 2-28(4) of the Act provides that when return home is not the permanency goal, the State may

> "file a motion to terminate parental rights of any parent who has failed to make reasonable efforts to correct the conditions which led to the removal of the child or reasonable progress toward the return of the child, as defined in subdivision (D)(m) of Section 1 of the Adoption Act or for whom any other unfitness ground for terminating parental rights as defined in subdivision (D) of Section 1 of the Adoption Act exists." *Id.* § 2-28(4)(b).

This section addresses when the permanency goal is not to return home. It does not address situations in which the permanency goal *is* to return home. However, section 2-13(4) of the Act, in clear language, provides that a party may file a motion with the court requesting termination of parental rights "at any time after the entry of a dispositional order." *Id.* § 2-13(4). It does not require a permanency goal of returning home as a prerequisite to filing. We will not read a procedural requirement into the Act that is not there. *A.A.*, 2015 IL 118605, ¶ 21. We conclude that the plain language of the Act allows the State to file a petition to terminate parental rights at any time following the dispositional hearing at which the minor is made a ward of the court. As the State filed its termination petition after the dispositional hearing in this case (although, admittedly, seemingly immediately after), we find the State complied with the requirements of the Act and the trial court was correct to deny respondent's motion to dismiss the State's petition.

¶ 54                                    B. Unfitness

¶ 55         The trial court determined that respondents were unfit on two grounds under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). It found that respondents (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare (*id.* § 50/1(D)(b)) and (2) failed to protect the child from conditions within his environment injurious to the child's welfare (*id.* § 50/1(D)(g)). Both grounds of unfitness are based on the premise that respondents should have known of the physical abuse A.C. suffered from January 2020 through April 2020. Respondents both challenge each ground of unfitness.

¶ 56                              1. *Jennifer's Arguments*

¶ 57         We begin by addressing two additional arguments Jennifer raises related to the second ground of unfitness. She contends that (1) a determination that some of A.C.'s injuries were due to nonaccidental trauma does not prove by clear and convincing evidence that Jennifer is the party responsible for the injuries and (2) "to the extent that it was determined that once a child has been determined to have been abused, each parent is deemed to have presumptively failed to protect the child without regard to whether they were the actual perpetrator or unsuspecting bystander, *** such application of section 1(D)(g) violates her substantive due process."

¶ 58         In addressing Jennifer's first argument, we emphasize the trial court did not find Jennifer abused A.C. In fact, it specifically avoided making an outright determination as to which parent, if either, was the perpetrator of the abuse, noting that such a determination was not necessary to find respondents unfit.

¶ 59         However, Jennifer is correct that the trial court held her responsible for A.C.'s injuries in that it found she failed to protect him or prevent those injuries from occurring. She maintains that the court's characterization of the injuries as nonaccidental fails to establish this

responsibility on her part. We disagree. Jennifer misses a second, crucial step in the court's analysis. The court did not merely find that A.C.'s injuries were nonaccidental and summarily hold her responsible for their infliction. Rather, it looked at the circumstances of the injuries, the likelihood that Jennifer was aware of them, and the steps, if any, she took to address them. Considering all three factors, it determined the injuries were of a nature that Jennifer should have been aware of them and yet failed to adequately address them. It was not the classification of the injuries as nonaccidental that the court relied on its determination, but the actions, or inaction, of Jennifer. We therefore are not persuaded by Jennifer's first argument.

¶ 60        We are similarly unconvinced by her second argument. We begin with a general discussion of the constitutional framework guiding our analysis. Because parents have a fundamental right to raise their children and section 1(D)(g) of the Adoption Act seeks to infringe on that right, it must survive strict scrutiny in order to be deemed constitutional. *In re R.C.*, 195 Ill. 2d 291, 304 (2001). In other words, it must be narrowly tailored and necessary to serve a compelling state interest. *Id.* Respondent does not dispute that the State has a compelling interest in protecting the welfare of children. Rather, she argues only that section 1(D)(g) is not narrowly tailored. A statute is narrowly tailored if it uses the least restrictive means to attain its goal. *In re H.G.*, 197 Ill. 2d 317, 330 (2001).

¶ 61        Jennifer relies on *In re Amanda D.*, 349 Ill. App. 3d 941 (2004), to support her position. In *Amanda D.*, the court held that a section of the Adoption Act finding parents presumptively unfit if they had prior convictions for aggravated battery to a child violated the parents' substantive due process. *Id.* at 955. The court reasoned that the statute created a "proxy" for parental unfitness by way of a parent's prior convictions. *Id.* at 947. Being a member of the proxy class did not necessarily render a parent a member of the unfit class, so the section was

therefore not narrowly tailored. *Id.* at 949. The court held that "[s]omething more would be required to narrow the proxy class" before the relevant section could be deemed constitutional. *Id.*

¶ 62 Similar to the argument of the respondent in *Amanda D.*, Jennifer argues section 1(D)(g) creates an "irrebuttable presumption" of parental unfitness. Specifically, she interprets section 1(D)(g) as creating a presumption that a parent's mere presence in the home where a child is being abused renders that parent unfit. She argues that "[t]he mere fact of being present in the home while clandestine abuse is occurring is not a sufficient proxy for parental unfitness."

¶ 63 We disagree with Jennifer's interpretation of section 1(D)(g) and find no such presumption in the language of this section. Section 1(D)(g) provides that a parent is unfit specifically where she "fail[s] to protect the child from conditions within his environment injurious to the child's welfare," not where she is merely present in the home where abuse occurs. 750 ILCS 50/1(D)(g) (West 2022). In other words, section 1(D)(g) requires the State to present evidence of a parent's failure to protect the child from an injurious environment, which the court then considers in determining unfitness. There is no presumption mechanism at play in this section, but merely the relationship between a fact (failure to protect A.C. from an injurious environment) and its legal result (unfitness determination). See *People v. Ray*, 88 Ill. App. 3d 1010, 1014 (1980).

¶ 64 In addition to holding that section 1(D)(g) does not create a presumption of unfitness, we further find that it is narrowly tailored to meet the State's interest in protecting the welfare of children. A statute is narrowly tailored if it targets and eliminates no more than the source of evil it seeks to remedy. *Amanda D.*, 349 Ill. App. 3d at 946. Section 1(D)(g) accurately identifies parents who are not fit to care for their children without casting so wide a net as to implicate those who are. Unlike the section at issue in *Amanda D.*, section 1(D)(g) does not create a "proxy" for parental unfitness that may be unrelated to a parent's actual ability to care for her

child, like a past conviction of a certain crime; rather the ground of unfitness created by section 1(D)(g) is directly related to such ability. See *H.G.*, 197 Ill. 2d at 331. As a result, under no circumstances would section 1(D)(g) erroneously include a fit parent in the group of parents who have failed to protect their children from conditions in their environment injurious to their welfare. *Id.* at 333 (stating a ground of unfitness related to a child's time spent in foster care was not narrowly tailored because a parent could still be fit despite the child having spent the statutorily prescribed amount of time in care); *R.C.*, 195 Ill. 2d 291, 305 (2001) (Where the statutory ground of unfitness was based not on mental impairment alone, but on a parent's inability to discharge parental responsibilities as a result of mental impairment, it was narrowly tailored because, "[b]y definition, a child who is being raised by a person who is unable to discharge his parental responsibilities might not 'receiv[e] proper care.' ").

¶ 65          Statutes are presumed constitutional, and the burden is on the party challenging a statute's constitutionality to prove its invalidity. *Amanda D.*, 349 Ill. App. 3d at 943-44. We find respondent has not met this burden. We therefore turn our analysis to whether the trial court's determination that respondents were unfit pursuant to this section was against the manifest weight of the evidence.

¶ 66                      2. *Environment Injurious to A.C.'s Welfare*

¶ 67          Under section 1(D)(g) of the Adoption Act, a parent may be found unfit for failing to protect his or her child from an environment injurious to the child's welfare. 750 ILCS 50/1(D)(g) (West 2022). A parent cannot be found unfit under section 1(D)(g) for a period of time in which the parent's child was in foster care. *In re C.W.*, 199 Ill. 2d 198, 212 (2002). However, a parent may be found unfit under this section based on the conduct that gave rise to the original adjudication of neglect. *Id.* at 218-19. "[T]here is no requirement under section 1(D)(g) that a

parent be permitted a period of time to correct or improve an injurious environment before he or she may be found unfit on this ground." *Id.* at 216. We will not reverse a trial court's determination of unfitness unless it is against the manifest weight of the evidence. *In re Janine M.A.*, 342 Ill. App. 3d 1041, 1049 (2003). A decision is against the manifest weight of the evidence where the opposite conclusion is clearly evident. *Id.*

¶ 68        While the court here did not determine the person responsible for A.C.'s injuries, it did determine that, over the course of five months in respondents' care, he sustained numerous nonaccidental bruises and fractures, as well as significant damage to his spinal cord. His injuries have rendered him an incomplete quadriplegic, a condition that will likely be lifelong. Testimony was presented showing respondents knew of A.C.'s recurring bruises and his difficulty moving and that A.C. frequently expressed pain, crying or becoming fussy when he was moved. The court determined that given the size of the home, the number of injuries, and the nature of those injuries, even a nonabusive parent should have been aware that A.C. was experiencing abuse. We do not find this determination to be against the manifest weight of the evidence. See *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 73 (affirming a trial court's unfitness determination where evidence showed a mother must have known of her children's injuries at the hands of their father but did not act to protect them). Although evidence was presented in respondents' favor, we do not find it of a degree to make the opposite conclusion clearly evident.

¶ 69        Any one ground of unfitness is sufficient to support an overall finding of unfitness. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). Because we have determined respondents failed to protect A.C. from an environment injurious to his welfare, we need not determine if they failed to maintain a reasonable degree of interest, concern, or responsibility for his welfare.

¶ 70                                C. Best Interest

¶ 71    After finding a parent unfit, a trial court must determine if it is in the child's best interest that parental rights be terminated. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009). In making this determination, the court must consider the following factors:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *Id.* (citing 705 ILCS 405/1-3(4.05) (West 2008)).

A court must consider all statutory factors but need not reference each in its decision. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. Additionally, courts may also consider factors such as the nature and length of the child's relationship with her present caretaker and the effect that a change in placement would have on her emotional well-being. *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 27. We will reverse a trial court's best-interest determination only if it is against the manifest weight of the evidence. *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005).

¶ 72    Respondents argue the trial court's determination that it was in A.C.'s best interest to terminate their parental rights was against the manifest weight of the evidence. Jennifer argues their home was clean and in a good school district and she was trained to provide appropriate medical care for A.C. She notes the strong bond between herself and A.C. but argues her ability to visit with him was hindered by A.C.'s foster mother, who, she claims, stopped inviting her to

- 24 -

holiday events, stopped informing her of A.C.'s medical appointments, and intentionally scheduled other doctor's appointments during her visits. She cites *In re O.S.*, 364 Ill. App. 3d 628 (2006), for her argument that "[w]here the court or the agency undertook to limit and prevent a parent from having normal visitation with her child, the bond between the parent and the child cannot be properly evaluated" for purposes of a best-interest determination.

¶ 73       Andrew, for his part, presents two main contentions. He first argues that "a parent's refusal to acknowledge abuse or admit to abuse cannot be used to terminate parental rights when, as here, their beliefs have support by qualified medical experts." Second, he argues that although A.C. has been in foster care for the majority of his life, the State's actions prolonged the case and that delay should not be chargeable to Andrew.

¶ 74                              1. *Jennifer's Argument*

¶ 75       We begin with Jennifer's contention that her visits with A.C. were thwarted by A.C.'s foster parents, which prevented the trial court from evaluating their bond for a best-interest determination. We find the case she cites easily distinguishable. In *O.S.*, the mother's children were placed into foster care due to her illegal drug use. *Id.* at 630. The mother was later incarcerated for drug-related convictions. *Id.* While in prison, Lutheran Social Services, a designee of DCFS, did not allow visitation between the mother and her children. *Id.* at 631. After her release, visitation with her son was delayed, and, when it was allowed, the mother was ordered not to tell her son she was his mother. *Id.* at 632. The bonding assessment provided at the mother's best-interest hearing indicated that her son's primary attachment was to his foster parents and not his mother, whom he viewed as an aunt figure. *Id.* at 633. The appellate court reversed the decision of the trial court that it was in the son's best interest to terminate the mother's parental rights, finding that "[i]n this case, the court-enforced restrictions on frequency, place, and nature of the interaction robbed the

- 25 -

visitation of all its usual and meaningful attributes. The State might just as well have prohibited all visitation." *Id.* at 639.

¶ 76 Here, Jennifer does not allege that she was denied all visitation with A.C., or even substantial visitation with A.C. Nor does she allege that she was compelled to hide the fact of her relation to him or that the trial court, or any agency, interfered in her bonding with her son. In fact, contrary to her assertions on appeal, Jennifer testified at the best-interest hearing that both she and Andrew had visits three times a week with A.C. and had formed a strong bond with him. We do not find the fact that Jennifer missed a few visits with A.C. due to scheduling conflicts to have so prevented the two from establishing a bond that the trial court would have been unable to evaluate it at the best-interest hearing.

¶ 77                                        2. *Andrew's Arguments*

¶ 78 Andrew argues that a parent's refusal to acknowledge abuse or admit to abuse cannot be used to terminate parental rights if their beliefs are supported by qualified medical experts. We find this argument irrelevant, as nothing in the record suggests the trial court considered respondents' denials of abuse in making its best-interest determination. The court referenced its previous finding that A.C. had suffered nonaccidental injuries but did so only to introduce the fact of his many complex medical issues and disabilities and to determine who could better care for him. The foster parents' experience in caring for A.C., combined with their superior bond to A.C., appeared to be the two factors to which the court gave greatest weight in making its decision.

¶ 79 Further, we find that Andrew misstates the conclusions of the cases he cites in support of his argument, *In re Yohan K.*, 2013 IL App (1st) 123472, and *In re Avery F.*, 2024 IL App (1st) 231089. Andrew contends that "[t]aken together, *Yohan K.* and *Avery F.* stand for the proposition that a parent's refusal to acknowledge abuse or admit to abuse cannot be used to

- 26 -

*terminate parental rights*." However, neither case concerns a petition to terminate parental rights. Instead, both cases concern decisions of trial courts made at dispositional hearings to make minors wards of the court. *Yohan K.*, 2013 IL App (1st) 123472, ¶ 3; *Avery F.*, 2024 IL App (1st) 231089, ¶ 64. An adjudication of wardship is an entirely different proceeding than a termination of parental rights under the Act, and so we find these cases inapplicable to the case at hand. To illustrate the point, one statutory factor courts *must* consider in making a best-interest determination when deciding whether to terminate parental rights is the physical safety of the minor. 705 ILCS 405/1-3(4.05)(a)-(j) (West 2022). For this purpose, the fact that A.C. sustained extensive injuries while in the care of Andrew and Jennifer, but neither parent admitted to abusing him, is very much a relevant consideration for his future safety.

¶ 80          As a final distinguishing factor, *Yohan K.* and *Avery F.* do not state that a court should not consider a parent's denial of abuse in determining whether to make a minor a ward of the court, but rather the denial should not be the *sole* reason for the court's decision. *Yohan K.*, 2013 IL App (1st) 123472, ¶ 153 ("We completely reject any notion that parents should be declared unable to care for their children *merely* because they persist in their own belief of innocence of wrongdoing." (Emphasis added.)); *Avery F.*, 2024 IL App (1st) 231089, ¶ 54 ("[W]e reject the respondent's assertion that the trial court applied an incorrect legal standard or *placed undue emphasis* on her refusal to recognize that the severe injuries to her older two children were caused by physical abuse." (Emphasis added.)). To the extent the trial court considered respondents' continuing denials of abuse in making its best-interest decision, in combination with other factors, we find it did not err.

¶ 81          Andrew next argues that the amount of time A.C. spent in foster care, and accordingly, the greater bond A.C. developed with his foster parents, should not be chargeable to

him. Although Andrew details delays in the present court case, particularly a *Frye* hearing (see *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)) that "the [State] insist[ed] on," he does not allege that any actions taken by the State over the course of this case were improper or specifically intended to delay the case and weaken A.C.'s bond with his parents. This case was complex, described by the trial court as "the most difficult case for [him] on the bench ever." It involved numerous stages and countless motions and answers that unavoidably extended the life of the case. Whether or not it is the fault of respondents that A.C. has lived the majority of his life with his foster parents and developed a close bond with them as a result, the focus of a best-interest hearing is not on perceived fairness to the parents, but rather on the well-being of the minor. In fact, it is well-established that a court may consider the length of time a child has been in foster care, as well as the relative bonds he has with his biological parents and foster parents, in making its best-interest determination. *Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 27; 705 ILCS 405/1-3(4.05)(d) (West 2022). We therefore find the court did not err in so doing, even if the length of time A.C. spent in foster care was not attributable to respondents.

¶ 82                              3. *Overall Best-Interest Determination*

¶ 83          Evidence at the hearing established that A.C. is strongly bonded to his foster family, including his foster siblings, and is accepted in their wider community. His foster parents are experienced in tending to his complex medical needs and enthusiastic in doing so. They have expressed a desire to adopt him, should the opportunity arise. He is well-adjusted to his current placement and would experience disruption if moved. For these reasons, we find the trial court's determination that it was in the best interest of A.C. to terminate respondents' parental rights was not against the manifest weight of the evidence.

¶ 84                              III. CONCLUSION

¶ 85        For the reasons stated, we affirm the trial court's judgment.

¶ 86        Affirmed.